UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| RAVIT PAB, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | CASE NO. 3:19-cv-1480 |
| § | |
| CHANVEASNA SOM and DANY OUN SOM, § | JURY TRIAL DEMANDED |
| § | |
| Defendants. § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

1. This is an action brought by a survivor of labor trafficking. Defendants Chanveasna Som and Dany Oun Som worked with a recruiter in Cambodia named Piseth Seng to obtain cheap and easily exploited labor for the donut shop they owned and operated in North Texas. Seng approached Plaintiff Ravit Pab, then a university student in Cambodia, and encouraged him enter the United States State Department's Diversity Immigrant Visa lottery. After Mr. Pab was selected for further processing in the Diversity Immigrant Visa Program, Seng fraudulently induced him to incur significant debt and to take out exorbitant loans to pay visa processing and travel fees. Seng falsely promised Mr. Pab that he had arranged for Mr. Pab to work in the United States at a job that paid $3,000 per month, more than enough to quickly pay off his debts.

2. The representations that Defendants' recruiter made to Mr. Pab were fraudulent. Far from receiving $3,000 per month as Seng had promised, Mr. Pab worked more than 12 hours per day, seven days per week in Defendants' donut shop and received no take-home pay. After Defendants ordered Mr. Pab to work at an associate's donut shop in Brownwood, Texas, to pay off his debt, Mr. Pab continued to work more than 12 hours per day, seven days per week for three months, and only received $500 total in wages, a sum well below the Texas minimum wage.

3. Through this scheme, Defendants created a situation where Mr. Pab worked long hours for little to no take-home pay, with no reasonable prospects for leaving Defendants' employment. Defendants' recruiter had induced Mr. Pab to take on significant debt through fraudulent promises of a well-paying job. Facing crippling debt, the threat of harm to himself and his family in Cambodia, and with no assets to support himself, Mr. Pab had no choice but to continue working for Defendants on Defendants' terms.

4. Mr. Pab brings this action to recover damages against Defendants arising from this scheme. Mr. Pab alleges claims against Defendants for violation of his rights under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and for failure to pay his wages free and clear under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, ("FLSA") and the Texas Minimum Wage Act ("TMWA").

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), and 29 U.S.C. § 216(b) (FLSA).

6. Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

7. This Court has supplemental jurisdiction over the claims based on Texas state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of facts which support the federal claims.

8. Venue in the Northern District of Texas is proper under 28 U.S.C. § 1391 in that two of the Defendants reside and/or may be found in this District, and a substantial portion of the communications, transactions, events, or omissions underlying Mr. Pab's claims occurred in this District.

## PARTIES

9. Plaintiff Ravit Pab is a Cambodian citizen. He is a resident of Georgia. Mr. Pab has consented to the filing of this action for violations of the FLSA, *see* Exhibit A.

10. Upon information and belief, Defendant Chanveasna Som is an individual who resides in New Boston, Texas, and owned and operated the donut shop Jimmy's Donuts together with his wife, Defendant Dany Oun Som, during Mr. Pab's period of employment. Defendant Chanveasna Som may be served with process at 23 Hunnington Dr., New Boston, Texas 75570.

11. Upon information and belief, Defendant Dany Oun Som is an individual who resides in New Boston, Texas, and owned and operated the donut shop Jimmy's Donuts together with her husband, Defendant Chanveasna Som, during Mr. Pab's period of employment. Defendant Dany Oun Som may be served with process at 23 Hunnington Dr., New Boston, Texas 75570.

## RELEVANT NON-PARTIES

12. Defendants cooperated with recruiters in Cambodia to engage in recruitment of workers on their behalf, including, without limitation, Piseth Seng. Such individuals are referred to herein as the "Recruiters."

13. Defendants also colluded with an individual named Ponderic Sim, who agreed to appear as an affiant in support of Mr. Pab's Diversity Immigrant Visa application.

14. Yannsiha Yim is an individual who resides in Brownwood, Texas, and owns and operates the donut shop Donut Palace. Through Defendants, Yim employed Mr. Pab for several months.

## STATEMENT OF FACTS

A. *Labor Trafficking in the Restaurant Industry*

15. Plaintiff is a Cambodian national who was trafficked from Cambodia to the United States by Defendants.

16. The restaurant industry in the United States is repeatedly recognized as one of the common industries vulnerable to trafficking.[1]

17. An analysis by Polaris reported that victims of labor trafficking have been found in restaurants and food service, where "victims can be confined at the restaurant around the clock or be isolated in a nearby home provided by the traffickers." As with other forms of labor trafficking, restaurant-based traffickers often recruit their victims through false promises and high fees before trapping their victims in their restaurants.[2]

18. These traffickers often take advantage of their staff's lack of English language skills to isolate their victims from help and avoid detection.[3]

B. *Human Trafficking in Cambodia*

19. From 2013 to 2015, the U.S. Department of State (DOS) categorized Cambodia as a "Tier 2 Watch List" country, indicating that the Cambodian government had neither met the TVRPA's minimum standards for protecting trafficking victims and prosecuting traffickers nor

---

[1] *See Restaurants and Food Service*, NATIONAL HUMAN TRAFFICKING HOTLINE, https://humantraffickinghotline.org/labor-trafficking-venuesindustries/restaurantsfood-service (last visited Aug. 2, 2018); Maria Godoy, *In U.S. Restaurants, Bars, and Food Trucks, "Modern Slavery" Persists*, NPR, Mar. 29, 2017, https://www.npr.org/sections/thesalt/2017/03/29/521971468/in-u-s-restaurants-bars-and-food-trucks-modern-slavery-persists.

[2] POLARIS, THE TYPOLOGY OF MODERN SLAVERY: DEFINING SEX AND LABOR TRAFFICKING IN THE UNITED STATES 29–30 (Mar. 2017), https://polarisproject.org/sites/default/files/Polaris-Typology-of-Modern-Slavery.pdf.

[3] *Id.*

demonstrated an increasing effort to do so.[4]

20. Since 2016, the DOS has taken Cambodia off of the Tier 2 Watch List due to the Cambodian government's recent efforts to improve TVRPA compliance.[5] However, the DOS continues to describe Cambodia as a "Tier 2" country—one which fails to meet the TVRPA's minimum standards, but has demonstrated efforts to do so—and "a source, transit, and destination country for men, women, and children subjected to forced labor and sex trafficking."[6]

21. Traffickers operating in Cambodia "are most commonly family or community members or small networks of independent brokers."[7] The DOS reports that corrupt officials in the Cambodian government have facilitated trafficking crimes and thwarted anti-trafficking investigations.[8]

C. *The Diversity Visa Program*

22. The Immigration and Nationality Act (INA), 8 U.S.C. § 1153(c), provides for the issuance of immigrant visas to individuals from countries with low rates of immigration to the United States. Under this Diversity Immigrant Visa ("DV") Program, the DOS may issue up to 50,000 visas per fiscal year to such individuals, allocated among the regions of the world, with more visas available to individuals from regions with statistically lower rates of immigration. *Id*. at § 1153(c)(1)(E),(F).

23. An individual is eligible for the DV visa if he or she is a native of a "low-admission" state and has either the equivalent of a high school education or at least two years of work experience in an occupation that requires at least two years of training or experience. 22 C.F.R.

---

[4] U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT 110 (2015).
[5] U.S. DEP'T OF STATE, TRAFFICKING IN PERSONS REPORT (2018).
[6] *Id.* at 53–54, 127.
[7] *Id.* at 128.
[8] *Id.*

§ 42.33(a)(1).

24. In addition, a DV visa applicant—like any other alien—must show that she is not otherwise inadmissible for a visa or admission to the United States. *See generally* 8 U.S.C. § 1182. This burden includes showing that the applicant will not become a public charge in the United States. *Id*. at § 1182(a)(4). DV visa applicants may prove that they will not become a public charge by having a U.S. resident submit a Form I-134 Affidavit of Support,[9] but such submissions are not required. Unlike employment-based or temporary guest worker visas, DV visas do not require the applicant to have a sponsoring employer: an immigrant entering the U.S. on a DV visa enters as a Lawful Permanent Resident.

25. Selection for DV visas is based on a randomized lottery. *Id.* at § 1153(e)(2). To enter the lottery, an individual must submit a visa petition via an electronic entry form on the DOS's website. 22 C.F.R. § 42.33(b)(3). Using a random number generating computer program, the DOS approves a certain number of petitions from each region of the world. *Id*. at § 42.33(c). Individuals selected by the lottery then prepare a DS-260 visa application and appear at their country's U.S. Embassy or Consulate for a visa interview.[10]

26. DV applicants have been the target of fraud schemes and scams. The DOS and the Federal Trade Commission have issued warnings on their websites regarding DV lottery scams; they warn of scammers who solicit fees by promising potential applicants increased odds of winning or even by posing as the U.S. government.[11] In at least one high-profile case, labor

---

[9] *See I-134, Affidavit of Support*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, https://www.uscis.gov/i-134 (last visited July 17, 2018).

[10] For a summary of the diversity immigrant visa process, see Diversity Visa Program, U.S. DEPT. OF STATE, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry.html (last visited July 17, 2018). .

[11] *Diversity Lottery Scams*, FED. TRADE COMMISSION, https://www.consumer.ftc.gov/articles/0080-diversity-visa-lottery-scams (last visited July 17, 2018);

traffickers have been convicted of criminal trafficking for exploiting the DV visa program to traffic their victims.[12]

   D. *Defendants Recruited Mr. Pab in Cambodia under Fraudulent Terms to Work in their Donut Shops.*

27. To staff their donut shop, Defendants colluded with Recruiters in Cambodia. Each year, Recruiters, including Piseth Seng, went to the college where Mr. Pab studied and distributed DV visa applications to the student body. In 2013, one of the Recruiters came to Mr. Pab's classroom and asked Mr. Pab and his classmates to fill out the applications and return them to school officials.

28. In 2016, Mr. Pab received a phone call from Seng, informing him that he had won the DV lottery asking to set up a meeting. At the meeting, Seng showed Mr. Pab and his parents documents from the U.S. Department of State showing that Mr. Pab and two other individuals had won the DV lottery. However, Seng did not hand over Mr. Pab's documents.

29. At this first meeting, Seng told Mr. Pab that he would need a sponsor in the United States to remain eligible and in compliance with the visa requirements. Seng told Mr. Pab that Seng would connect him with a sponsor if he could not find one on his own.

30. When Mr. Pab, who had no contacts in the U.S., failed to find his own sponsor, Seng gave him the contact information for Defendants Chanveasna and Dany Oun Som. After speaking with him on the phone, Defendants agreed to "host" Mr. Pab in their home in Royse City,

---

*Fraud Warning: Diversity Program Scammers Sending Fraudulent Emails and Letters*, U.S. DEPT. OF STATE, https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/fraud.html (last visited July 17, 2018).

[12] *See e.g.*, HUMAN RIGHTS FIRST, DISMANTLING THE BUSINESS OF HUMAN TRAFFICKING 8–9, http://www.humanrightsfirst.org/sites/default/files/HRF-6-Trafficking-Cases-Analyzed.pdf (last visited July 17, 2018) (analyzing the facts of *United States v. Akouavi Kpade Afolabi,* 508 Fed. App'x 111 (3rd Cir. 2013), a criminal trafficking case in which defendants used derivative DV visas to traffic girls from Togo and Ghana to work in their New Jersey hair-braiding salons).

Texas, and to employ him at their donut shop called Jimmy's Donuts.

31. Shortly thereafter, Seng took Mr. Pab to the offices of the Banteay Meanchey Provincial Police Department to apply for a passport, for which Mr. Pab paid $100.

32. About two weeks after their first meeting, Seng met with Mr. Pab and his parents at their church in Banteay Meanchey Province. Seng told Mr. Pab that before he could go to the U.S., he would have to pay an $8,000 fee—$7,000 in "legal fees" and $1,000 for Mr. Pab's plane ticket. Seng stated that his DV applicants each year pay the same amount and told Mr. Pab not to worry about the magnitude of the fee because Defendants would pay him $3,000 a month to work in their donut shop, allowing him to easily pay back his debts.

33. At the end of this meeting, Mr. Pab and his parents signed a contract committing to pay Seng's fee. Mr. Pab believed that if he did not sign, he would not receive his visa. To raise the $8,000, Mr. Pab and his mother borrowed approximately $6,000 from their neighbors. According to the World Bank, the Gross National Income (GNI) per capita in Cambodia for the year 2016 was $1,140.[13]

34. Mr. Pab next met Seng in Phnom Pehn, Cambodia's capital, where he underwent the medical examination and criminal background check required to get his visa.

35. Mr. Pab met Seng again in Phnom Penh before his visa interview at the United States Embassy Seng told Mr. Pab that an individual named Ponderic Sim—not the Soms—would serve as his sponsor for purposes of his DV visa and would provide housing to Mr. Pab upon his arrival in Texas. Following this conversation, Mr. Pab told his interviewers that he would live with Sim upon his arrival in the United States.

---

[13] *Cambodia Data*, WORLD BANK, https://data.worldbank.org/country/cambodia (last visited April 15, 2019).

36. On May 4, 2017, the DOS issued Mr. Pab a DV visa. Seng accompanied him to the U.S. Embassy in Phnom Penh to retrieve it. Seng retained the visa.

37. A few weeks later, Seng traveled to Mr. Pab's hometown in Banteay Meanchey Province to collect his fees. Of the approximately $6,000 that Mr. Pab and his mother borrowed from their neighbors, Mr. Pab gave approximately $4,500 to pay Seng for the plane ticket and about half of his "legal fees."

38. The day of his flight, Mr. Pab and his parents travelled to Phnom Pehn, where they met Seng to receive Mr. Pab's visa and other paperwork. Mr. Pab spent approximately $500 on his and his parents' travel costs from Banteay Meanchey Province to the airport in Phnom Penh, and took the approximately $1,000 that remained from the loan with him to the United States. When Mr. Pab traveled to the United States, he and his parents still owed $3,500 to Seng and $6,000 to his parents' neighbors.

E. *Defendants Introduced New Debts and Depressed Mr. Pab's Wages to Coerce Him Continued Labor in their Donut Shop.*

39. Mr. Pab flew from Phnom Penh and arrived in Dallas, Texas, on May 24, 2017. Defendants Chanveasna and Dany Oun Som picked him up at the airport and drove him to their house in Royse City, where they moved him into a room with two of their relatives.

40. During his first week in Texas, Defendants told Mr. Pab that he owed them $5,000 in "sponsoring fees." Defendants claimed that they had paid Ponderic Sim $5,000 to be Mr. Pab's sponsor. Mr. Pab did not expect this new debt, which Seng had never mentioned, but he believed that he had to pay it to keep his job and maintain his visa status.

41. To pay off his alleged debt to Defendants and his debts to Seng and his neighbors in Cambodia, Mr. Pab began working at Jimmy's Donuts, under Defendants' supervision and control, on May 25, 2017.

42. Together with his wife, Defendant Chanveasna Som hired and possessed the power to fire Mr. Pab; controlled Mr. Pab's work schedule and the conditions of his employment; determined Mr. Pab's pay rate, i.e., $1,000 per month credited to his "debt"; and supervised Mr. Pab's work.

43. Together with her husband, Defendant Dany Oun Som hired and possessed the power to fire Mr. Pab; controlled Mr. Pab's work schedule and the conditions of his employment; determined Mr. Pab's pay rate, i.e., $1,000 per month credited to his "debt"; and supervised Mr. Pab's work.

44. On average, Mr. Pab worked 80 to 90 hours per week in the donut shop. He started making donuts at 1:00 or 2:00 each morning and worked until 2:00 or 3:00 in the afternoon.

45. Mr. Pab received no take-home pay for his work. Instead, Defendants told him that they would deduct $1,000 from his debt for each month he worked for them. Mr. Pab never signed any agreement with Defendants authorizing them to deduct these "loan recoupments" from his earned wages.

46. Even if Defendants paid Mr. Pab his wages free and clear, a wage rate of $1,000 per month for the extremely long hours worked by Mr. Pab is significantly less than the state and federal minimum wage rate of $7.25 per hour that Defendants were required to pay Mr. Pab for his work.

47. Furthermore, Defendants failed to pay the required one and one-half times the regular rate of pay—here, the statutory minimum wage—for all hours Mr. Pab worked over forty in a workweek.

48. At all times relevant to this action, Defendants failed to maintain and preserve complete and accurate records of Mr. Pab's hours of work as required by the FLSA. And at all

times relevant to this action, Defendants' failure to maintain and preserve complete and accurate records of Mr. Pab's hours of work was intentional.

49. In June of 2017, Mr. Pab received a call from his mother, who stated that she could not repay their debts to Seng and their neighbors: Mr. Pab and his parents still owed approximately $3,500 to Seng and approximately $6,000 to their neighbors. Because Defendants were withholding Mr. Pab's wages through their loan recoupment scheme, Mr. Pab's only prospect for paying off his creditors in Cambodia was to take out another loan. Mr. Pab's mother asked him to borrow money from Defendants to pay off Seng and their neighbors. Defendants ultimately transferred approximately $10,500 to Mr. Pab's mother. After this transfer was made, Defendants informed Mr. Pab that they were charging him an additional $500 loan fee. Mr. Pab now owed Defendants $16,000, minus the amounts—if any—that were credited to his debt from his wages.

50. Unbeknownst to Mr. Pab, Defendants arranged for Recruiter Seng to meet with his parents in Cambodia and have them sign a contract in exchange for the loan. Under this contract, Mr. Pab's parents promised that Mr. Pab would work for Defendants for the next five years and permitted Defendants to draw from Mr. Pab's monthly pay without limit.

51. Mr. Pab was desperate to leave Defendants' home and find work elsewhere. However, Defendants had lured him into a situation where he faced a crippling amount of debt, threats of harm to himself or his parents if the debt was not paid off, and he had no practical way to repay. Because Mr. Pab received no take-home pay, lacked any contacts in the United States, and spoke limited English, he had no way to sustain himself if he left Defendants' home without support. Nor could he afford a flight back to Cambodia.

F. *Defendants Continued to Employ Coercive Methods to Keep Mr. Pab Dependent on his Employment with them.*

52. To limit Mr. Pab's ability to leave their employ, Defendants discouraged him from

making other contacts in the United States. Mr. Pab occasionally left Defendants' house to go to church and to attempt to make friends in the neighborhood. When Defendant Chanveasna Som learned that Mr. Pab was venturing out alone he grew enraged, and he refused to open the door when Mr. Pab's new acquaintances came to visit.

53. Mr. Pab's few Khmer-speaking, Cambodian contacts were unwilling or unable to help him leave Defendants' employment. Shortly after beginning his work at Jimmy's Donuts, Mr. Pab called Recruiter Seng for help. When Mr. Pab told Seng that he no longer wished to work for and live with Defendants, Seng informed him that he had to stay with Defendants until he finished working off his debt. Seng then gave Mr. Pab the contact information of a local Cambodian woman named Carry Sok. However, when Defendants overheard Sok calling Mr. Pab through the Facebook app, they confiscated Mr. Pab's phone and blocked Sok as a contact on his Facebook account. When Mr. Pab got his phone back and tried to call Sok again, she replied that she could not help him—she did not want to start trouble with Defendants.

54. Defendants took possession of Mr. Pab's green card for two months after he arrived in the United States. Defendants claimed that they were holding his green card so that they could apply for a Social Security card on his behalf, but no Social Security card arrived.

55. After consulting with another employee of Jimmy's Donuts, Mr. Pab asked Defendants to return his green card so that he could apply for a Social Security card on his own. This request angered Chanveasna Som, but he eventually relinquished Mr. Pab's green card.

56. In August 2017, Defendants announced that they were closing Jimmy's Donuts and returning to Cambodia for an unspecified amount of time. They asked Mr. Pab to accompany them to Cambodia to marry one of their nieces so that she could come to the United States. Mr. Pab declined.

57. After Defendants closed Jimmy's Donuts, they transferred Mr. Pab to Donut Palace in Brownwood, Texas. According to their "accounting," Mr. Pab was allegedly more than $10,000 in debt to Defendants at this time.

58. Yannsiha Yim, who Plaintiff believed to be Defendants' nephew or friend, operated Donut Palace. Under Yim's supervision and control, Plaintiff worked at Donut Palace from August 2017 to November 15, 2017. During that period, Plaintiff worked from 60 to 70 hours per week.

59. Following Defendants' orders, Yim also did not give Mr. Pab regular take-home pay. Rather, Yim transferred $1,000 per month to Defendants to repay Mr. Pab's "debt."

60. On one occasion, Yim paid Mr. Pab $500 on top of the monthly $1,000 loan recoupment. Mr. Pab received no further take-home pay after this $500.

G. *After Mr. Pab's Escape from their Employ, Defendants Threatened Mr. Pab and his Family in an Attempt to Secure his Return and Future Forced Labor.*

61. Mr. Pab worked at Donut Palace until November 2017. By this date, Mr. Pab had worked in the United States for nearly six months and received only $500 in wages. The entire time, Mr. Pab worked under the shadow of crippling debt to Defendants. Even accepting that Defendants had in fact deducted $1,000 from the debt each month, at least $10,000 of debt still remained.

62. Defendants attempted to use the debt as leverage against both Mr. Pab and his parents to coerce Mr. Pab's continued forced labor. Mr. Pab's mother begged him not to anger his employers, fearing that any trouble in Texas would lead her to be targeted by associates of Defendants in Cambodia because of the contract she signed.

63. With the help of near-strangers he connected with on Facebook, Mr. Pab was able to escape from Defendants' control on November 15, 2017. After he left Donut Palace, Defendants and Recruiter Seng began to harass him by phone and on Facebook. They also began to harass his

parents in Cambodia in an attempt to secure his return and future labor.

64. Seng began to forward threatening voicemails from Defendant Dany Oun Som to Mr. Pab. In these messages, Defendant Dany Oun Som yelled at Mr. Pab, claiming that he could not stay in the United States without paying the debt and that his parents would lose their house in Cambodia. On one occasion, Defendants threatened to send Dany Oun Som's sister, recruiter Seng, and the Cambodian police to dispossess Plaintiff's parents of their home. Defendants did not stop harassing Mr. Pab's parents until Plaintiff's counsel sent a letter demanding that Defendants cease and desist all contact with Mr. Pab and his family.

## FIRST CLAIM FOR RELIEF

**Trafficking in Persons for the Purposes of Forced Labor and Involuntary Servitude
18 U.S.C. §§ 1589, 1590, 1593A, 1594, and 1597**

65. Plaintiff is authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the TVPRA, 18 U.S.C. § 1595.

66. Plaintiff is a victim of forced labor, human trafficking, and unlawful conduct with immigration documents in violation of 18 U.S.C. § 1589, 1590, and 1597.

67. Defendants attempted to and did subject Plaintiff to forced labor in violation of 18 U.S.C. § 1589.

68. Defendants knowingly obtained the labor and services of Plaintiff through serious harm and threats of serious harm, including serious financial harm, in violation of 18 U.S.C. § 1589(a)(2). Defendants induced Plaintiff to work in their donut shop under the pretense of fraudulent employment terms and promises, and then intentionally kept Plaintiff in a condition of financial vulnerability so that he had no choice but to labor for Defendants.

69. Defendants knowingly obtained the labor and services of Plaintiff by means of a scheme, plan, or pattern which, in the totality of the circumstances, was intended to coerce and did

coerce Plaintiff to believe that he would suffer serious harm if he were to leave the employ of Defendants, in violation of 18 U.S.C. § 1589(a)(4). Defendants' scheme included fraudulent promises of employment conditions, which induced Plaintiff to incur substantial debt in order to travel to the United States, and material changes to the promises upon Plaintiff's arrival in Texas. This scheme forced Plaintiff into a position where he had no choice but to work for Defendants under unlawful conditions to which he never agreed.

70. Defendants threatened to call the police to enforce a fraudulently induced debt in order to coerce Plaintiff's further forced labor, in a manner that constitutes an abuse of legal process under 18 U.S.C. § 1589(a)(3).

71. Defendants knowingly recruited, harbored, transported, and/or obtained Plaintiff for labor or services in violation of laws prohibiting forced labor, in violation of 18 U.S.C. § 1590.

72. Alternatively, Defendants have knowingly benefited financially and/or by receiving the value of labor from Plaintiff through their participation in a venture which Defendants knew or should have known was engaged in trafficking violations, in violation of 18 U.S.C. §§ 1589, 1593A, and 1595. Defendants and/or Defendants' agents or accomplices intentionally promised employment terms, including wage rates, which Defendants had no intention of keeping. Because of their participation in such venture, Defendants knowingly received numerous benefits including:

   a. Having a worker recruited from Cambodia;

   b. Having cheap and easily exploitable labor available to staff Defendants' businesses;

   c. Having Plaintiff perform chores in Defendants' homes.

73. Defendants and Recruiters conspired to commit the violations of the TVPRA described herein, in violation of 18 U.S.C. § 1594. Defendants worked in partnership with the

Recruiters in Cambodia to implement a scheme of fraudulent recruitment practices, designed to induce Plaintiff to incur significant debts to secure a DV-1 visa and enter Defendant's employment. Defendants used the financial vulnerability created by this recruitment scheme to obtain Plaintiff's labor through serious harm and/or the threat of serious harm, as described above.

74. Plaintiff suffered injury as a proximate result of these actions.

75. Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate, including but not limited to:

   a. compensation at the minimum wage rate for the work done while at Jimmy's Donuts and Donut Palace;

   b. damages for emotional pain and suffering;

   c. compensation for all moneys paid during the recruitment process and in order to come to the United States to work for Defendants;

   d. punitive damages; and

   e. reasonable costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF

**Unlawful Conduct with Respect to Documents in Furtherance of Trafficking**
**18 U.S.C. § 1592**

76. Plaintiff is authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the TVPRA, 18 U.S.C. § 1595.

77. Defendants knowingly confiscated or possessed Plaintiff's immigration documents or government identification documents in the course of violating, or with intent to violate, 18 U.S.C. §§ 1589, 1590 (forced labor and trafficking), in violation of 18 U.S.C. § 1592(a).

78. Plaintiff suffered injury as a proximate result of these actions.

79. Plaintiff is entitled to compensatory and punitive damages in an amount to be

determined at trial and any other relief deemed appropriate, including but not limited to:

a. damages for emotional pain and suffering;

b. punitive damages; and

c. reasonable costs and attorneys' fees.

## THIRD CLAIM FOR RELIEF

### Violations of the Fair Labor Standards Act
### 29 U.S.C. § 201, *et seq*.

80. This count sets forth a claim for declaratory relief and damages for each Defendant's violation of the minimum wage and overtime provisions of the FLSA.

81. Upon information and belief, at all times relevant to this action Jimmy's Donuts was a sole proprietorship owned and operated by Defendants Dany Oun Som and Chanveasna Som.

82. Upon information and belief, at all times relevant to this action Jimmy's Donuts was an enterprise engaged in commerce or in the production of goods for commerce within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), in that said enterprise had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce, by any person, (including, e.g., fryers, ovens, and baking supplies and ingredients) and in that said enterprise had an annual gross volume of sales made or business done in excess of $500,000, exclusive of excise taxes at the retail level which are separately stated.

83. Additionally, while employed at Jimmy's Donuts by Defendants, Plaintiff was an individual engaged in the production of goods for interstate commerce within the meaning of Sections 3(j) and 7(a)(1) of the FLSA, 29 U.S.C. §§ 203(j), 207(a)(1), in that he was employed in

producing, handling, and/or working on products (including, e.g., fryer oil) that went on to travel in interstate commerce.

84. During the time that they employed Plaintiff, Defendants violated the FLSA, 29 U.S.C. § 206, by failing to pay Plaintiff the proper minimum wage rate.

85. During the time that they employed Plaintiff, Defendants violated the FLSA, 29 U.S.C. § 207(a), by failing to pay Plaintiff the proper overtime wage rate.

86. Defendants' failure to pay Plaintiff the federally mandated minimum wages and overtime wages was a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

87. As a consequence of Defendants' violations of the FLSA, Plaintiff is entitled to recover the unpaid minimum and overtime wages owed him by that Defendant, plus an additional equal amount in liquidated damages, the costs of suit, and reasonable attorney's fees pursuant to 29 U.S.C. § 216(b).

## FOURTH CLAIM FOR RELIEF

### Violations of the Texas Minimum Wage Act
### TEX. LAB. CODE § 62.057

88. In the alternative to Plaintiff's third claim for relief, Plaintiff sets forth a claim for damages resulting from Defendants' failure to pay Plaintiff the minimum wage under Texas law.

89. During the time that they employed plaintiff, Defendants violated the TMWA, TEX. LAB. CODE § 62.057, by failing to pay Plaintiff at least the state minimum wage for all hours worked. Defendants deducted loan recoupment from Plaintiff's wages—without first securing Plaintiff's written consent to do so—and depressed Plaintiff's pay below the minimum wage.

90. As a consequence of Defendants' violations of the TMWA, Plaintiff is entitled to recover the unpaid minimum wages owed by Defendants, plus an additional equal amount in liquidated damages, the costs of suit, and reasonable attorneys' fees. TEX. LAB. CODE §§ 62.201,

62.205.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court to:

a. Declare Defendants in violation of the TVPRA, as set forth above;

b. Declare Defendants in violation of the FLSA or, in the alternative, the TMWA, as set forth above;

c. Award actual damages, including restitution; compensatory damages; and punitive damages for Defendants' violations of the TVPRA;

d. Award damages for Defendants' failure to pay the overtime and minimum wages required by the FLSA or, in the alternative, the minimum wage required by the TMWA, and an equal amount of liquidated damages;

e. Award Plaintiff the cost of this action;

f. Award Plaintiff reasonable attorney's fees;

g. Award Plaintiff pre-judgment interest, where appropriate, and post-judgment interest; and

h. Grant such other relief as the Court deems just and appropriate.

Dated:  June 21, 2019

Respectfully submitted,

EQUAL JUSTICE CENTER

By: /s/ Christopher J. Willett
Christopher J. Willett
Texas State Bar No. 24061895
cwillett@equaljusticecenter.org

Rebecca C. Eisenbrey
Texas State Bar No.: 24097646
(App. for admission to N.D. Texas pending)

reisenbrey@equaljusticecenter.org
510 S. Congress Ave., Ste. 206
Austin, Texas 78704
Tel: (512) 474-0007 ext. 107
Fax: (512) 474-0008

Reema Ali
Texas State Bar No. 24105327
rali@equaljusticecenter.org
1250 W. Mockingbird Ln., Ste. 455
Dallas, Texas 75247
Tel: (469) 228-4234
Fax: (469) 941-0861

ATTORNEYS FOR PLAINTIFF